# LEFKOWITZ, ATTORNEY GENERAL OF NEW YORK, ET AL. *v.* TURLEY ET AL.

No. 72–331. Argued October 10, 1973—Decided November 19, 1973

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, BLACKMUN, POWELL, and REHNQUIST, JJ., joined, and in which BRENNAN, J., joined by a separate qualifying opinion, in which DOUGLAS and MARSHALL, JJ., joined, *post*, p. 85.

*Brenda Soloff,* Assistant Attorney General of New York, argued the cause for appellants. With her on the brief for appellants Lefkowitz et al. were *Louis J. Lefkowitz,* Attorney General, *pro se,* and *Samuel A. Hirshowitz,* First Assistant Attorney General. A separate brief was filed for appellant Tutuska.

*Richard O. Robinson* argued the cause and filed a brief for appellees.

MR. JUSTICE WHITE delivered the opinion of the Court.

New York General Municipal Law §§ 103–a and 103–b and New York Public Authorities Law §§ 2601 and 2602 require public contracts to provide that if a contractor refuses to waive immunity or to answer questions when called to testify concerning his contracts with the State or any of its subdivisions, his existing contracts may be canceled and he shall be disqualified from further transactions with the State for five years.[1] In addition to

___

[1] N. Y. Gen. Munic. Law §§ 103–a and 103–b (Supp. 1973–1974) provide:

Section 103–a. Ground for cancellation of contract by municipal corporations and fire districts:

"A clause shall be inserted in all specifications or contracts made or awarded by a municipal corporation or any public department, agency or official thereof on or after the first day of July, nineteen

specifying these contract terms, the statutes require disqualification from contracting with public authorities upon failure of any person to waive immunity or to

hundred fifty-nine or by a fire district or any agency or official thereof on or after the first day of September, nineteen hundred sixty, for work or services performed or to be performed, or goods sold or to be sold, to provide that upon the refusal of a person, when called before a grand jury, head of a state department, temporary state commission or other state agency, . . . head of a city department, or other city agency, which is empowered to compel the attendance of witnesses and examine them under oath, to testify in an investigation concerning any transaction or contract had with the state, any political subdivision thereof, a public authority or with any public department, agency or official of the state or of any political subdivision thereof or of a public authority, to sign a waiver of immunity against subsequent criminal prosecution or to answer any relevant question concerning such transaction or contract,

"(a) such person, and any firm, partnership or corporation of which he is a member, partner, director or officer shall be disqualified from thereafter selling to or submitting bids to or receiving awards from or entering into any contracts with any municipal corporation, or fire district, or any public department, agency or official thereof, for goods, work or services, for a period of five years after such refusal, and to provide also that

"(b) any and all contracts made with any municipal corporation or any public department, agency or official thereof on or after the first day of July, nineteen hundred fifty-nine or with any fire district or any agency or official thereof on or after the first day of September, nineteen hundred sixty, by such person, and by any firm, partnership, or corporation of which he is a member, partner, director or officer may be cancelled or terminated by the municipal corporation or fire district without incurring any penalty or damages on account of such cancellation or termination, but any monies owing by the municipal corporation or fire district for goods delivered or work done prior to the cancellation or termination shall be paid.

"The provisions of this section as in force and effect prior to the first day of September, nineteen hundred sixty, shall apply to specifications or contracts made or awarded by a municipal corpora-

answer questions with respect to his transactions with the State or its subdivisions. The issue in this case is whether these sections are consistent with the Four-

---

tion on or after the first day of July, nineteen hundred fifty-nine, but prior to the first day of September, nineteen hundred sixty."

Section 103–b. Disqualification to contract with municipal corporations and fire districts:

"Any person, who, when called before a grand jury, head of a state department, temporary state commission or other state agency, . . . head of a city department or other city agency, which is empowered to compel the attendance of witnesses and examine them under oath, to testify in an investigation concerning any transaction or contract had with the state, any political subdivision thereof, a public authority, or with a public department, agency or official of the state or of any political subdivision thereof or of a public authority, refuses to sign a waiver of immunity against subsequent criminal prosecution or to answer any relevant question concerning such transaction or contract, and any firm, partnership or corporation of which he is a member, partner, director or officer shall be disqualified from thereafter selling to or submitting bids to or receiving awards from or entering into any contracts with any municipal corporation or fire district, or with any public department, agency or official thereof, for goods, work or services, for a period of five years after such refusal or until a disqualification shall be removed pursuant to the provisions of section one hundred three-c of this article.

"It shall be the duty of the officer conducting the investigation before the grand jury, the head of a state department, the chairman of the temporary state commission or other state agency, . . . the head of a city department or other city agency before which the refusal occurs to send notice of such refusal, together with the names of any firm, partnership, or corporation of which the person so refusing is known to be a member, partner, officer or director, to the commissioner of transportation of the state of New York and the appropriate departments, agencies and officials of the state, political subdivisions thereof or public authorities with whom the person so refusing and any firm, partnership or corporation of which he is a member, partner, director or officer, is known to have a contract. However, when such refusal occurs before a body other than a grand jury, notice of refusal shall not be sent for a period of ten days after such refusal occurs. Prior to the expiration of

teenth Amendment insofar as it makes applicable to the States the Fifth Amendment privilege against compelled self-incrimination.

---

this ten day period, any person, firm, partnership or corporation which has become liable to the cancellation or termination of a contract or disqualification to contract on account of such refusal may commence a special proceeding at a special term of the supreme court, held within the judicial district in which the refusal occurred, for an order determining whether the questions in response to which the refusal occurred were relevant and material to the inquiry. Upon the commencement of such proceeding, the sending of such notice of refusal to answer shall be subject to order of the court in which the proceeding was brought in a manner and on such terms as the court may deem just. If a proceeding is not brought within ten days, notice of refusal shall thereupon be sent as provided herein."

N. Y. Pub. Auth. Law §§ 2601 and 2602 (Supp. 1973–1974) provide:

Section 2601. Ground for cancellation of contract by public authority:

"A clause shall be inserted in all specifications or contracts hereafter made or awarded by any public authority or by any official of any public authority created by the state or any political subdivision, for work or services performed or to be performed or goods sold or to be sold, to provide that upon the refusal by a person, when called before a grand jury, head of a state department, temporary state commission or other state agency, . . . head of a city department, or other city agency, which is empowered to compel the attendance of witnesses and examine them under oath, to testify in an investigation concerning any transaction or contract had with the state, any political subdivision thereof, a public authority or with any. public department, agency or official of the state or of any political subdivision thereof or of a public authority, to sign a waiver of immunity against subsequent criminal prosecution or to answer any relevant question concerning such transaction or contract,

"(a) such person, and any firm, partnership or corporation of which he is a member, partner, director or officer shall be disqualified from thereafter selling to or submitting bids to or receiving awards from or entering into any contracts with any public authority or official thereof, for goods, work or services, for a period of five years after such refusal, and to provide also that

"(b) any and all contracts made with any public authority or

# I

Appellees are two architects licensed by the State of New York. They were summoned to testify before a grand jury investigating various charges of conspiracy,

official thereof, since the effective date of this law, by such person and by any firm, partnership or corporation of which he is a member, partner, director or officer may be cancelled or terminated by the public authority without incurring any penalty or damages on account of such cancellation or termination, but any monies owing by the public authority for goods delivered or work done prior to the cancellation or termination shall be paid."

Section 2602. Disqualification to contract with public authority:

"Any person, who, when called before a grand jury, head of a state department, temporary state commission or other state agency, . . . head of a city department, or other city agency, which is empowered to compel the attendance of witnesses and examine them under oath, to testify in an investigation concerning any transaction or contract had with the state, any political subdivision thereof, a public authority or with a public department, agency or official of the state or of any political subdivision thereof or of a public authority, refuses to sign a waiver of immunity against subsequent criminal prosecution or to answer any relevant questions concerning such transaction or contract, and any firm, partnership or corporation, of which he is a member, partner, director, or officer shall be disqualified from thereafter selling to or submitting bids to or receiving awards from or entering into any contracts with any public authority or any official of any public authority created by the state or any political subdivision, for goods, work or services, for a period of five years after such refusal or until a disqualification shall be removed pursuant to the provisions of section twenty-six hundred three of this title.

"It shall be the duty of the officer conducting the investigation before the grand jury, the head of a state department, the chairman of the temporary state commission or other state agency, . . . the head of a city department or other city agency before which the refusal occurs to send notice of such refusal, together with the names of any firm, partnership or corporation of which the person so refusing is known to be a member, partner, officer or director, to the commissioner of transportation of the state of New York, or the commissioner of general services as the case may be, and the appropriate

bribery, and larceny. They were asked, but refused, to sign waivers of immunity, the effect of which would have been to waive their right not to be compelled in a criminal case to be a witness against themselves. They were then excused and the District Attorney, as directed by law, notified various contracting authorities of appellees' conduct and called attention to the applicable disqualification statutes. Appellees thereupon brought this action alleging that their existing contracts and future contracting privileges were threatened and asserted that the pertinent statutory provisions were violative of the constitutional privilege against compelled self-incrimination. A three-judge District Court was convened and declared the four statutory provisions at issue unconstitutional under the Fourteenth and Fifth Amendments, 342 F. Supp. 544 (WDNY 1972). We noted probable jurisdiction, 410 U. S. 924 (1973). The State appealed pursuant to 28 U. S. C. § 1253. We affirm the judgment of the District Court.

---

departments, agencies and officials of the state, political subdivisions thereof or public authorities with whom the persons [sic] so refusing and any firm, partnership or corporation of which he is a member, partner, director or officer, is known to have a contract. However, when such refusal occurs before a body other than a grand jury, notice of refusal shall not be sent for a period of ten days after such refusal occurs. Prior to the expiration of this ten day period, any person, firm, partnership or corporation which has become liable to the cancellation or termination of a contract or disqualification to contract on account of such refusal may commence a special proceeding at a special term of the supreme court, held within the judicial district in which the refusal occurred, for an order determining whether the questions in response to which the refusal occurred were relevant and material to the inquiry. Upon the commencement of such proceeding, the sending of such notice of refusal to answer shall be subject to order of the court in which the proceeding was brought in a manner and on such terms as the court may deem just. If a proceeding is not brought within ten days, notice of refusal shall thereupon be sent as provided herein."

## II

The Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself." The Amendment not only protects the individual against being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings. *McCarthy* v. *Arndstein*, 266 U. S. 34, 40 (1924), squarely held that

> "[t]he privilege is not ordinarily dependent upon the nature of the proceeding in which the testimony is sought or is to be used. It applies alike to civil and criminal proceedings, wherever the answer might tend to subject to criminal responsibility him who gives it. The privilege protects a mere witness as fully as it does one who is also a party defendant."

In this respect, *McCarthy* v. *Arndstein* reflected the settled view in this Court. The object of the Amendment "was to insure that a person should not be compelled, when acting as a witness in any investigation, to give testimony which might tend to show that he himself had committed a crime." *Counselman* v. *Hitchcock*, 142 U. S. 547, 562 (1892). See also *Bram* v. *United States*, 168 U. S. 532, 542–543 (1897); *Brown* v. *Walker*, 161 U. S. 591 (1896); *Boyd* v. *United States*, 116 U. S. 616, 634, 637–638 (1886); *United States* v. *Saline Bank*, 1 Pet. 100 (1828). This is the rule that is now applicable to the States. *Malloy* v. *Hogan*, 378 U. S. 1 (1964). "It must be considered irrelevant that the petitioner was a witness in a statutory inquiry and not a defendant in a criminal prosecution, for it has long been settled that the privilege protects witnesses in similar federal inquiries."

*Id.,* at 11. In any of these contexts, therefore, a witness protected by the privilege may rightfully refuse to answer unless and until he is protected at least against the use of his compelled answers and evidence derived therefrom in any subsequent criminal case in which he is a defendant. *Kastigar* v. *United States,* 406 U. S. 441 (1972). Absent such protection, if he is nevertheless compelled to answer, his answers are inadmissible against him in a later criminal prosecution. *Bram* v. *United States, supra; Boyd* v. *United States, supra.*

Against this background, there is no room for urging that the Fifth Amendment privilege is inapplicable simply because the issue arises, as it does here, in the context of official inquiries into the job performance of a public contractor. Surely, the ordinary rule is that the privilege is available to witnesses called before grand juries as these appellee architects were. *Hale* v. *Henkel,* 201 U. S. 43, 66 (1906).

It is true that the State has a strong, legitimate interest in maintaining the integrity of its civil service and of its transactions with independent contractors furnishing a wide range of goods and services; and New York would have it that this interest is sufficiently strong to override the privilege. The suggestion is that the State should be able to interrogate employees and contractors about their job performance without regard to the Fifth Amendment, to discharge those who refuse to answer or to waive the privilege by waiving the immunity to which they would otherwise be entitled, and to use any incriminating answers obtained in subsequent criminal prosecutions. But claims of overriding interests are not unusual in Fifth Amendment litigation and they have not fared well.

In *McCarthy* v. *Arndstein, supra,* the United States insisted that because of the strong public interest in marshaling and distributing assets of bankrupts, the

Fifth Amendment should not protect a bankrupt during the official examinations mandated by the Bankruptcy Act. That position did not prevail. The bankrupt's testimony could be had, but only if he were afforded sufficient immunity to supplant the privilege. And long before *McCarthy* v. *Arndstein,* the Court recognized that without the compelled testimony of knowledgeable and perhaps implicated witnesses, the enforcement of the transportation laws "would become impossible," but nevertheless proceeded on a basis that witnesses must be granted adequate immunity if their evidence was to be compelled. *Brown* v. *Walker,* 161 U. S., at 610. Similarly, the enforcement of the antitrust laws against private corporations was at stake in *Hale* v. *Henkel, supra,* but immunity was essential to command the testimony of individual witnesses. Also, it would be difficult to overestimate the importance of the interest of the States in the enforcement of their ordinary criminal laws; but the price for incriminating answers from third-party witnesses is sufficient immunity to satisfy the imperatives of the Fifth Amendment privilege against compelled self-incrimination. Finally, in almost the very context here involved, this Court has only recently held that employees of the State do not forfeit their constitutional privilege and that they may be compelled to respond to questions about the performance of their duties but only if their answers cannot be used against them in subsequent criminal prosecutions. *Garrity* v. *New Jersey,* 385 U. S. 493 (1967); *Gardner* v. *Broderick,* 392 U. S. 273 (1968); *Sanitation Men* v. *Sanitation Comm'r,* 392 U. S. 280 (1968).

## III

In *Garrity* v. *New Jersey,* certain police officers were summoned to an inquiry being conducted by the Attorney General concerning the fixing of traffic tickets.

They were asked questions following warnings that if they did not answer they would be removed from office and that anything they said might be used against them in any criminal proceeding. No immunity of any kind was offered or available under state law. The questions were answered and the answers later used over their objections, in their prosecutions for conspiracy. The Court held that "the protection of the individual under the Fourteenth Amendment against coerced statements prohibits use in subsequent criminal proceedings of statements obtained under threat of removal from office, and that it extends to all, whether they are policemen or other members of our body politic." 385 U. S., at 500. The Court also held that in the context of threats of removal from office the act of responding to interrogation was not voluntary and was not an effective waiver of the privilege against self-incrimination, the Court conceding, however, that there might be other situations "where one who is anxious to make a clean breast of the whole affair volunteers the information." *Id.,* at 499.

The issue in *Gardner* v. *Broderick, supra,* was whether the State might discharge a police officer who, after he was summoned before a grand jury to testify about the performance of his official duties and was advised of his right against compulsory self-incrimination, then refused to waive that right as requested by the State. Conceding that appellant could be discharged for refusing to answer questions about the performance of his official duties, if not required to waive immunity, the Court held that the officer could not be terminated, as he was, for refusing to waive his constitutional privilege. Although under *Garrity* any waiver executed may have been invalid and any answers elicited inadmissible in evidence, the State did not purport to recognize as much and instead

attempted to coerce a waiver on the penalty of loss of employment. The "testimony was demanded before the grand jury in part so that it might be used to prosecute him, and not solely for the purpose of securing an accounting of his performance of his public trust." 392 U. S., at 279. Hence, the State's statutory provision requiring his dismissal for his refusal to waive immunity could not stand.

The companion case, *Sanitation Men* v. *Sanitation Comm'r, supra,* was to the same effect. Here again, public employees were officially interrogated and advised that refusal to answer and sign waivers of immunity would lead to dismissal. Here again, the Court held that the State presented the employees with "a choice between surrendering their constitutional rights or their jobs," 392 U. S., at 284, although clearly they would "subject themselves to dismissal if they refuse to account for their performance of their public trust, after proper proceedings, which do not involve an attempt to coerce them to relinquish their constitutional rights." *Id.,* at 285.

These cases, and their predecessors, ultimately rest on a reconciliation of the well-recognized policies behind the privilege of self-incrimination, *Murphy* v. *Waterfront Comm'n,* 378 U. S. 52, 55 (1964), and the need of the State, as well as the Federal Government, to obtain information "to assure the effective functioning of government," *id.,* at 93 (WHITE, J., concurring). Immunity is required if there is to be "rational accommodation between the imperatives of the privilege and the legitimate demands of government to compel citizens to testify." *Kastigar* v. *United States,* 406 U. S., at 446. It is in this sense that immunity

statutes have "become part of our constitutional fabric." *Ullmann* v. *United States,* 350 U. S. 422, 438 (1956).[2]

We agree with the District Court that *Garrity, Gardner,* and *Sanitation Men* control the issue now before us. The State sought to interrogate appellees about their transactions with the State and to require them to furnish possibly incriminating testimony by demanding that they waive their immunity and by disqualifying them as public contractors when they refused. It seems to us that the State intended to accomplish what *Garrity* specifically prohibited—to compel testimony that had not been immunized. The waiver sought by the State, under threat of loss of contracts, would have been no less compelled than a direct request for the testimony without resort to the waiver device. A waiver secured under threat of substantial economic sanction cannot be

---

[2] In *Orloff* v. *Willoughby,* 345 U. S. 83 (1953), a doctor inducted into the Army was denied a commission as an officer after refusing to divulge whether he was a Communist, as required by a loyalty certificate prescribed for commissioned officers. Instead he asserted his "Federal constitutional privilege" when called upon to answer the question. In holding that the Government was justified in refusing the commission because of the failure to answer, the Court had no occasion to consider whether Orloff would have been exposed to criminal prosecution if he had stated that he was a member of the Communist Party. The case differs significantly from the one before us since the State here asks the architects to affirmatively expose themselves to criminal prosecution by waiving their privilege against self-incrimination, or from *Garrity,* where the threat of criminal prosecution was apparent both from the nature of the proceeding, and the absence of applicable state immunity statutes.

*Kimm* v. *Rosenberg,* 363 U. S. 405 (1960), is also inapposite. The Court there held that an alien whose deportation had been ordered was ineligible for a discretionary order permitting his voluntary departure, because he had failed to establish that he was not affiliated with the Communist Party. Petitioner's imminent departure from the country, whether it was voluntary or compelled, obviously made the threat of criminal prosecution on the basis of his answer remote.

termed voluntary. As already noted, *Garrity* specifically rejected the claim of an effective waiver when the policemen in that case, in the face of possible discharge, proceeded to answer the questions put to them. 385 U. S., at 498. The same holding is implicit in both *Gardner* and *Sanitation Men*.

The State nevertheless asserts that whatever may be true of state employees, a different rule is applicable to public contractors such as architects. Because independent contractors may not depend entirely on transactions with the State for their livelihood, it is suggested that disqualification from contracting with official agencies for a period of five years is neither compulsion within the meaning of the Fifth Amendment nor a forbidden penalty for refusing to answer questions put to them about their job performance. But we agree with the District Court that "the plaintiffs' disqualification from public contracting for five years as a penalty for asserting a constitutional privilege is violative of their Fifth Amendment rights." 342 F. Supp., at 549. We fail to see a difference of constitutional magnitude between the threat of job loss to an employee of the State, and a threat of loss of contracts to a contractor.[3]

If the argument is that the cost to a contractor is small in comparison to the cost to an employee of losing his job, the premise must be that it is harder for a state employee to find employment in the private sector, than it is for an architect. An architect lives off his contracting fees as surely as a state employee lives off his salary, and fees and salaries may be equally hard to come by in the private sector after sanctions have been taken by

---

[3] As *Garrity* succinctly put it: "The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." 385 U. S. 493, 497 (1967).

the State. In some sense the plight of the architect may be worse, for under the New York statutes it may be that any firm that employs him thereafter will also be subject to contract cancellation and disqualification.[4] A significant infringement of constitutional rights cannot be justified by the speculative ability of those affected to cover the damage.

IV

We should make clear, however, what we have said before. Although due regard for the Fifth Amendment forbids the State to compel incriminating answers from its employees and contractors that may be used against them in criminal proceedings, the Constitution permits that very testimony to be compelled if neither it nor its fruits are available for such use. *Kastigar* v. *United States, supra.* Furthermore, the accommodation between the interest of the State and the Fifth Amendment requires that the State have means at its disposal to secure testimony if immunity is supplied and testimony is still refused. This is recognized by the power of the courts to compel testimony, after a grant of immunity, by use of civil contempt and coerced imprisonment. *Shillitani* v. *United States,* 384 U. S. 364 (1966). Also, given adequate immunity, the State may plainly insist that employees either answer questions under oath about the performance of their job or suffer the loss of employment. By like token, the State may insist that the architects involved in this case either respond to relevant inquiries about the performance of their contracts or suffer cancellation of current relationships and disqualification from contracting with public agencies for an appropriate time in the future. But the State may not insist that appellees

---

[4] The contract disqualifications apply not only to the person who refuses to waive immunity but also to "any firm, partnership or corporation of which he is a member, partner, director or officer . . . ."

waive their Fifth Amendment privilege against self-incrimination and consent to the use of the fruits of the interrogation in any later proceedings brought against them. Rather, the State must recognize what our cases hold: that answers elicited upon the threat of the loss of employment are compelled and inadmissible in evidence. Hence, if answers are to be required in such circumstances States must offer to the witness whatever immunity is required to supplant the privilege and may not insist that the employee or contractor waive such immunity.

*Affirmed.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE MARSHALL join.

I join the Court's opinion in all respects but one. It is my view that immunity which permits testimony to be compelled "if neither it nor its fruits are available for . . . use" in criminal proceedings does not satisfy the privilege against self-incrimination. "I believe that the Fifth Amendment's privilege against self-incrimination requires that any jurisdiction that compels a man to incriminate himself grant him absolute immunity under its laws from prosecution for any transaction revealed in that testimony." *Piccirillo* v. *New York,* 400 U. S. 548, 562 (1971) (BRENNAN, J., dissenting.)